```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

-------------------------------x
                               :
UNITED STATES OF AMERICA       :
                               :
v.                             :     NO. 3:06CR0059(AWT)
                               :
SHAMAR A. THORNTON             :
                               :
-------------------------------x
```

## **RULING ON DEFENDANT'S REVISED MOTION TO SUPPRESS**

For the reasons set forth below, defendant Shamar A. Thorton's revised motion to suppress is being denied.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On or about October 5, 2005, the Hartford DEA Task Force received information from a reliable confidential informant regarding an individual believed to be engaged in the sale and distribution of crack cocaine in the Bowles Park area of Hartford. This confidential informant had provided information to law enforcement several dozen times in the past; such information led to the arrest of individuals and seizure of contraband on approximately ten to twelve occasions. The informant provided a physical description of the suspect and a description of his vehicle. Based on the information provided by the informant, Task Force Agents Joseph Amato, Peter Borysevicz, Robert Burgos, and Brenon Plourde initiated surveillance at the Bowles Park Housing Project. On October 5, 2005, an individual who matched the physical description provided by the confidential informant was observed by Task Force Agents entering 251 Nahum

Drive and exiting a few minutes later.  The subject, later identified as defendant Shamar A. Thornton, was then observed entering the vehicle described by the confidential informant and driving away from 251 Nahum Drive.  The Task Force Agents continued their surveillance by following the defendant as he drove away.  At Granby Street and Westbourne Parkway, the defendant's vehicle rolled through a stop sign.  Then, the defendant's vehicle turned left onto Westbourne Parkway without using a turn signal or any hand signal.  These traffic violations were witnessed by Task Force Agent Burgos.  After the defendant turned, he had to stop because of heavy traffic on Westbourne Parkway.  While the defendant was stopped in traffic, he appeared to notice the Task Force Agents' unmarked vehicles; he was observed checking his mirrors and looking around as if looking for an escape route.  When the defendant put his vehicle in reverse, the Task Force Agents approached the vehicle.  Task Force Agent Burgos observed the defendant stuffing something into the small of his back or into the seat.  The defendant was removed from the vehicle and quickly handcuffed.

Agent Burgos began to conduct a pat-down of the defendant's person.  Then, Task Force Agent Plourde, a certified canine handler, retrieved his narcotics canine to sniff the defendant's vehicle and person.  The canine alerted to the defendant's buttocks area. As a crowd began to assemble in the area, the Task

Force Agents decided to transport the defendant to the Thomas Cadillac parking lot at Albany Avenue and Westbourne Parkway. At the parking lot, Burgos continued the pat-down of the defendant's person. As he did so, the defendant stated, "It's only a little bit of butter, I don't know what the big deal is." (Tr. 96). "Butter" is a street term for crack cocaine. As Burgos shook the defendant's pants, a plastic bag containing crack cocaine fell down his pants leg and onto the ground.

The Task Force Agents then proceeded with the defendant to 251 Nahum Drive, Apartment 1A, where they met Marquila Alexander, the defendant's girlfriend. The defendant remained in a car. Task Force Agents questioned Alexander, who stated that she lived in the apartment with the defendant. Alexander provided her written consent to a search of the apartment. In a bedroom dresser drawer containing clothes belonging to the defendant, the Task Force Agents found a Rossi .38 caliber revolver. In addition, a substance that later field tested positive for crack cocaine and .38 caliber ammunition were seized from a safe located inside a bedroom closet.

The defendant was transported to the DEA's Hartford field office. The defendant testified that, while they were on the elevator at the DEA office, Agent Borysevicz mentioned Alexander's daughter, brought up something "about DCF," and stated that "we could get Ms. Alexander involved." (Tr. 119-

120). Agent Borysevicz denies making any threats relating to Alexander or her child. At the DEA office, the defendant was advised of his <u>Miranda</u> rights. He waived his rights and provided a written statement in which he admitted ownership and possession of the crack cocaine, as well as the ammunition and the firearm found at 251 Nahum Drive.

On February 28, 2006, the defendant was arrested and charged by criminal complaint with Possession of a Firearm by a Convicted Felon. On March 8, 2006, a grand jury returned a three-count indictment charging the defendant with Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), Possession with Intent to Distribute 5 or More Grams of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 21 U.S.C. § 924(c)(1)(A).

The defendant moved to suppress (i) the controlled substances seized from his person; (ii) his statement that he had crack cocaine in his pants; (iii) objects seized from 251 Nahum Drive, Apartment 1A; and (iv) his oral and written statements made at the DEA's Hartford field office. The defendant also sought an evidentiary hearing on these issues. The court denied the defendant's request for a hearing and his motion to suppress on the papers. <u>See</u> Ruling on Defendant's Motion to Suppress and for a Hearing (Doc. No. 28). The defendant filed the instant

revised motion to suppress, and the court then held an evidentiary hearing on the defendant's first, second, and fourth contentions. However, the court concluded that the defendant did not meet his burden of demonstrating he was entitled to an evidentiary hearing with respect to the third contention.

**II. DISCUSSION**

A. The Controlled Substances

"The decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." United States v. Harrell, 268 F.3d 141, 148 (2d. Cir. 2001) (quoting Whren v. United States, 517 U.S. 806, 810 (1996)). Here, Task Force Agent Burgos observed the defendant roll through a stop sign and turn without signaling. Thus, a Task Force Agent observed the defendant commit traffic violations, and it was lawful for the Task Force Agents to stop him.

If a traffic stop is lawful, the driver and any passenger do not have a Fourth Amendment interest in not being ordered out of the stopped vehicle. See Pennsylvania v. Mimms, 434 U.S. 106 (1977) (once vehicle is lawfully stopped, ordering driver out of car is a *de minimis* intrusion and driver has no Fourth Amendment interest in not being ordered out of car); Maryland v. Wilson, 519 U.S. 408 (1997) (passengers in lawfully stopped car have no Fourth Amendment interest in not being ordered out of car).

Whether probable cause or reasonable suspicion exists is an objective inquiry and the "actual motivations of the individual officers involved" in the stop "play no role" in the analysis. Whren, 517 U.S. at 813. "[A] police officer who observes a traffic violation may stop a car without regard to what a reasonable officer would do under the circumstances and without regard to the officer's own subjective intent." United States v. Dhinsa, 171 F.3d 721, 724 (2d Cir. 1998). Moreover, "[a]n officer's use of a traffic violation as a pretext to stop a car in order to obtain evidence for some more serious crime is of no constitutional significance." Id. at 724. Therefore, once the defendant's vehicle was observed violating traffic regulations, the Task Force Agents were not only authorized to stop the vehicle, but also authorized to order the defendant to exit the vehicle and detain him for a reasonable period of time so that the agents could further their investigation.

In determining whether the information possessed by a law enforcement officer provided a sufficient basis for a particular stop, the court is required to look at the totality of the circumstances. United States v. Arvizu, 534 U.S. 266, 273 (2002); Alabama v. White, 496 U.S. 325, 330 (1990). "[T]he court must evaluate those circumstances 'through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" United States v. Colon, 250 F.3d

130, 134 (2d Cir. 2001) (quoting United States v. Bayless, 201 F.3d 16, 133 (2d Cir. 2000). The "totality of the circumstances" inquiry permits police officers to "make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, at 273 (quotations omitted).

Here, when the defendant detected the presence of the Task Force Agents, he put the vehicle in reverse and it appeared that he began to search for an escape route. As the agents converged on his car, the defendant was observed stuffing something into the small of his back or into the seat. Based on these observations, Agent Burgos began to pat down the defendant, which was justified. See Terry v. Ohio, 392 U.S. 1, 23 (1968) (a police officer may "tak[e] steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him."). Task Force Agent Plourde brought his narcotics canine to the defendant, and the narcotics canine alerted to the area of the defendant's buttocks. The agents decided to move to the parking lot at Albany Avenue and Westborne Parkway because the defendant was being loud and drawing a crowd. Once they were at the parking lot, Agent Burgos continued the pat-down of the defendant's person. Burgos shook the defendant's pants and a

plastic bag containing crack cocaine fell down the defendant's pants leg and onto the ground.

The Fourth Amendment permits law enforcement officers to initiate investigative stops when they have "reasonable suspicion, supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. at 30); see also United States v. Cortez, 449 U.S. 411, 417 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Here, with respect to each investigative step they took, the Task Force Agents had reasonable suspicion, supported by articulable facts, that criminal activity was afoot.

    B.    Statement During the Traffic Stop

The defendant argues that he was not given Miranda warnings prior to the admission he made to Burgos. See Miranda v. Arizona, 384 U.S. 436 (1966). However, the fact that the defendant was not given Miranda warnings does not provide grounds for suppression of his statement because he was not being interrogated at the time the statement was made.

"Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody'." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "The fundamental import of the privilege while an individual is in

custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478.

> It is clear therefore that the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

Rhode Island v. Innis, 446 U.S. 291, 300 (1980).

The defendant's admission to possessing crack cocaine was not in response to a custodial interrogation. The narcotics canine alerted to the presence of a controlled substance on the defendant's person. After the defendant was transported to the Thomas Cadillac parking lot, Burgos resumed the pat-down search, during which the defendant admitted to possessing "butter." The defendant testified that no questions were asked of him at the scene of his arrest, so the defendant's statement was not in response to any questioning by the Task Force Agents. Even though the defendant was in custody for the purpose of Miranda warnings, the statement offered by the defendant was not elicited during an interrogation. Therefore, there is no basis for suppressing the statement under Miranda.

C. <u>Search at 251 Nahum Drive</u>

The defendant renewed in this motion his argument, made in his original motion to suppress, that the objects seized from the apartment he shared with Marquila Alexander at 251 Nahum Drive should be suppressed. The court denied the defendant's request for an evidentiary hearing with respect to this renewed claim.

In response to the defendant's original motion to suppress, the government submitted a consent form signed by Alexander in which she represents that she freely consented to the search of the apartment and was not threatened or forced in any way. In support of his original motion, the defendant submitted an affidavit in which the defendant averred that he believed Alexander did not give her consent to a search of the apartment. The court concluded that the defendant had not met his burden of demonstrating he was entitled to an evidentiary hearing. <u>See</u> <u>United States v. Culotta</u>, 413 F.2d 1343, 1345 (2d Cir. 1969) (defendant seeking to suppress evidence bears the burden of demonstrating that there are disputed issues of fact that would justify an evidentiary hearing); <u>see</u> <u>also</u> <u>United States v. Gillette</u>, 383 F.2d 843, 848-49 (2d Cir. 1967) (the showing required to justify a hearing must be made by an affidavit of someone with personal knowledge of the underlying facts).

In connection with the instant motion, the defendant has submitted a second affidavit in which he avers that he viewed

Alexander's contact with the investigating agents in that he saw her come out of the building with her daughter and several officers and "she seemed extremely distressed and bothered." (See Doc. No. 48, ¶ 4). Defense counsel contacted Alexander about testifying and asked her to come to the evidentiary hearing, but she did not appear. Nor did she ever submit an affidavit stating facts that would support a conclusion that she did not freely consent to the search of the apartment. Therefore, the court concluded that the defendant had not met his burden of demonstrating that he was entitled to an evidentiary hearing on this claim. See United States v. Matlock, 415 U.S. 164 (1974) (search does not violate Fourth Amendment where one occupant consents and another, detained nearby in a police car, is not asked for consent).

    D.   Statements at the DEA Office

The defendant also argues that his oral and written statements at the DEA's Hartford field office should be suppressed because he did not knowingly and voluntarily waive his Miranda rights. "To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995).

1. <u>Knowing and Intelligent Waiver</u>

Agent Borysevicz testified that he read the <u>Miranda</u> warnings to the defendant from a pre-printed card, but the defendant argues that there is not a sufficient basis to conclude that he waived his <u>Miranda</u> rights because there was no testimony detailing what was printed on the card, and the card was never offered into evidence. The defendant also points out that his written statement does not contain a waiver of his rights.

Agent Borysevicz testified that he read the <u>Miranda</u> warnings to the defendant from a DEA Form 13 card that he had been using during arrests for the prior fifteen years, that the defendant stated that he understood those rights, and that the defendant indicated he wished to provide a statement notwithstanding those rights. In addition, the defendant's signed written statement indicates that he had been read his rights and that he understood them. Although the actual card from which the <u>Miranda</u> warnings were read was not entered into evidence, the testimony of Agent Borysevicz and the defendant's own written statement are sufficient to establish that the defendant knowingly and intelligently waived his <u>Miranda</u> rights.

2. <u>Voluntary Waiver</u>

The defendant suggests that his statements were involuntary because he only made them to the Agent Borysevicz out of fear for what could happen to Alexander and her child. The defendant

testified that, when they were in the elevator at the DEA's Hartford field office, Agent Borysevicz mentioned Ms. Alexander's daughter, told him that "we could get Ms. Alexander involved" and brought up something "about DCF." (Tr. 119-120). The defendant failed to offer any evidence to support his argument that the confession was involuntary other than his vague testimony about statements by Agent Borysevicz.

Agent Borysevicz testified that he never made any threats or coercive statements to the defendant in order to secure a confession. Borysevicz specifically denied threatening to have Alexander charged with a federal offense and specifically denied threatening to have DCF contacted because of the items that were found in the apartment. Moreover, the defendant's written statement reflects that he provided the statement "voluntarily, without threat or promise made to me by anyone." (Tr. 79). Based on this record, the court concludes that the government has shown by a preponderance of the evidence that the defendant's statements were voluntarily made.

**III. CONCLUSION**

For the reasons set forth above, Defendant's Revised Motion to Suppress (Doc. No. 36)is hereby DENIED.

It is so ordered.

Dated this 10th day of December 2007 at Hartford, Connecticut.

                                          /s/AWT
                                  Alvin W. Thompson
                         United States District Judge